COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:  Judges Fulton, Friedman and Chaney
Argued at Norfolk, Virginia


LECRAM OMARI SANDERS

                                                MEMORANDUM OPINION* BY
v.        Record No. 0723-22-1                  JUDGE JUNIUS P. FULTON, III
                                                JANUARY 16, 2024
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF HAMPTON
Bonnie L. Jones, Judge

Andrew M. Sacks (Stanley E. Sacks; Sacks & Sacks, P.C., on brief),
for appellant.

Mason D. Williams, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


A jury convicted Lecram Omari Sanders of aggravated malicious wounding, receiving a

stolen firearm, statutory burglary, and two counts of grand larceny.  Sanders contends that the

evidence was insufficient to sustain his convictions because his accomplice's testimony was

inherently incredible.  Additionally, he argues that the trial court erred in denying his motion to set

aside the verdict and order a new trial based on after-discovered impeachment evidence.  Finding no

error, we affirm the trial court's judgment.

                                        BACKGROUND

On appeal, we review the evidence "in the 'light most favorable' to the Commonwealth,

the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022)

(quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)).  Doing so requires us to "discard the

evidence of the accused in conflict with that of the Commonwealth, and regard as true all the

_____

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

On March 14, 2015, Hampton Police Officer Charles Meyer arrived at an apartment to investigate a reported burglary. The residents, Marquell Simpson and Tyrese Hansley, worked for the Navy and reported that they had left their apartment "secured" around 3:00 p.m. on March 13, 2015. When they returned around noon the next day, they discovered that Hansley's Xbox gaming console and Simpson's eight firearms, including a .45-caliber Taurus 1911 handgun, had been stolen. There were no signs of "forced entry."

On the night of March 15, 2015, Officer Meyer learned that Derrick Johnson, Simpson and Hansley's friend and Navy shipmate, was at a hospital receiving treatment for a gunshot wound in his leg. At the hospital, Johnson told Officer Meyer that a robber had shot him while Johnson waited in his vehicle at a stop light. Police searched Johnson's car and found a .45-caliber bullet cartridge casing and a bullet hole but no firearms.

On March 24, 2015, Karisha Seals and her boyfriend, Corey Boyd, visited her mother's apartment. Sanders and his brother were there with their uncle, Clyde Boyce, who was dating Seals's mother. When Boyd refused to greet Sanders's brother, Boyce became upset and struck Boyd with a chair. Sanders's brother placed Boyd in a "choke hold," and Seals's mother attacked him while Boyce retrieved a handgun. Boyce repeatedly "pistol whipped" Boyd's head. Sanders assisted by locking the door preventing Boyd from escaping. At some point, after Seals was able to unlock the door, Sanders "stopped the fight" and escorted Seals and Boyd outside. Boyd did not immediately report the incident to police but eventually provided a written statement describing the attack, implicating Boyce. At trial, Seals testified that she and Boyd delayed reporting the incident because they believed Sanders would kill them if they reported the incident to law enforcement.

In early April 2015, Boyd parked his car outside his house and noticed a suspicious Cadillac parked nearby. He saw a "young lady" exit the passenger side of the Cadillac and approach his car. She stopped and looked at him sitting in his car before returning to the Cadillac, which drove away. Boyd also noticed another suspicious vehicle drive past his workplace a few days later.

Around 11:30 p.m. on April 21, 2015, Boyd returned home from work and sat in his car with his friend, Terrance. Boyd noticed an unfamiliar vehicle parking nearby. Soon after, a man approached his car, stood five feet away, and shot Boyd six times before running away. Police arrived and treated Boyd's gunshot wounds. Boyd initially reported that Boyce shot him, although he later admitted at trial that he could not identify the shooter and had assumed it was Boyce due to their recent quarrel. Boyd testified that the shooter was standing about three feet from where he previously saw the young woman standing in front of his car. Police found bullet fragments inside Boyd's car and .45-caliber cartridge casings near the vehicle.

On May 5, 2015, Detective John Baer learned that Johnson told Navy investigators that he accidentally shot himself on March 14 and had discarded the gun. Johnson was "brought in" for an interview and eventually admitted that the gunshot wound was accidentally self-inflicted. Johnson was arrested for recklessly handling a firearm, and as he was being taken for booking on the misdemeanor charge of reckless handling of a firearm, Detective Carpenter was escorting Karisha Seals's mother into the building. She happened to see Johnson, and she told Detective Carpenter that Johnson was associated with Sanders, one of the people who was present when Boyd was pistol whipped. With this revelation, the detectives began to suspect Johnson's involvement in the burglary and Boyd's shooting. Initially denying wrongdoing, Johnson claimed that Sanders and a man named "Willy" had burglarized Simpson and Hansley's residence. He also claimed that he was at his home in York County with Willy when Boyd's

shooting occurred. After several hours of questioning, the detectives paused the interview to execute a search warrant for Johnson's residence, during which they found Simpson's stolen Taurus handgun. Subsequent forensic testing established that the handgun had fired the cartridge casing found in Johnson's car on March 14 and the bullet fragments and cartridge casings found near Boyd's vehicle on April 21.

The detectives returned to the police station and confronted Johnson about their discovery of the firearm in his house; Johnson continued to deny involvement in the crimes. Detective Baer told Johnson that he believed that Johnson "shot [Boyd] and Sanders made him do it." When Johnson continued to deny involvement, Detective Baer reiterated his belief that Sanders forced Johnson to shoot Boyd. Johnson then admitted that he and Sanders had burglarized Simpson and Hansley's apartment. He also admitted that he shot Boyd, although he claimed that Sanders had forced him to do so by threatening Johnson's family, saying "well, you can do it or I'm going to take care of you and your family" if he refused.[1]

Police later arrested Sanders during a traffic stop and searched his car, which contained Johnson's driving permit. They also searched Sanders and seized his cell phone.

At trial, Johnson testified that, before the incidents, he had been friends with Hansley and Simpson and would "hang out" at their apartment. Johnson was also friends with Sanders, who knew Johnson's family and had lent Johnson money to support them. At one point, Simpson showed Johnson his firearms collection and, in late January 2015, Simpson posted a photograph of the firearms on his Facebook account. Johnson testified that he shared the photograph with Sanders, who said that he "wanted" the guns and intended "to get them by any means necessary," even if "he had to kill" Hansley and Simpson. Sanders originally planned to steal the weapons

---

[1] At trial, Detective Baer admitted that he first suggested during the interview that Johnson shot Boyd or that Sanders had compelled Johnson to "do anything."

by disguising himself as a plumber but later directed Johnson to obtain the key to Hansley and Simpson's residence. Johnson testified that he acquired the key and participated in the burglary because "I figured if I let him get what he wants . . . that way they don't get hurt."

Shortly before midnight on March 13, 2015, Sanders drove Johnson to Simpson and Hansley's apartment. At Sanders's direction, Johnson emptied his pockets in Sanders's car before they entered the apartment using the stolen key. Sanders then took Simpson's firearms and directed Johnson to steal Hansley's Xbox. When they left the apartment early the next morning, Sanders gave Johnson the stolen Taurus handgun and kept the other property. Both Johnson's and Sanders's cell phone tower geolocation data demonstrated that their phones were in the vicinity of Simpson and Hansley's apartment "around midnight" on March 14, 2015.

Acknowledging that he initially lied to police concerning his gunshot wound, Johnson maintained that he accidentally shot himself with the stolen Taurus on March 15, 2015. He claimed that before going to the hospital, he drove to Sanders's apartment in Newport News around 8:30 p.m. and gave him the gun. Data on Sanders's cell phone contained a photograph, which was taken on March 15, 2015, at 8:50 p.m., depicting the Taurus handgun.

Johnson testified that Sanders convened a meeting at his brother's house after learning that Boyd had contacted police about the March 24 assault where Boyce had pistol whipped Boyd. According to Johnson, Sanders told his brother, Boyce, and Johnson that he intended to kill Boyd to prevent him from testifying against Boyce. Johnson testified that Sanders had discussed using a "woman" to "lure" Boyd into a trap; he and Sanders also drove past Boyd's workplace.

Johnson testified that around 10:00 p.m. on April 21, 2015, he called Sanders to ask "if he needed anything." Sanders said that he would pick Johnson up from his apartment and

instructed him to wear "something dark" and bring the Taurus handgun.[2] Sanders picked up Johnson and drove to a nearby 7-Eleven, where they waited for Sanders's brother to arrive. Sanders's brother did not arrive as planned, so Sanders instructed Johnson to kill Boyd; Johnson agreed to do so. Sanders gave Johnson a Bluetooth headset and "paired" it to their cell phones so that they could communicate during the shooting. Johnson testified that Sanders then called his cell phone to confirm that the Bluetooth headset had connected. Cell phone records established[3] that around 11:28 p.m. on April 21, 2015, Sanders's and Johnson's cell phones were engaged in a call just prior and during the shooting and were both near Boyd's house when the shooting took place. In addition, a search warrant revealed that Sanders's and Johnson's cell phones had "paired" with each other using an "LG Hbs 750" Bluetooth device.

Johnson further testified that around 11:30 p.m., he exited Sanders's car and approached Boyd's residence while Sanders parked behind Boyd's vehicle. As he approached Boyd's car, Sanders told him that Boyd was sitting in the driver's seat. Johnson repeatedly shot Boyd through the windshield and ran away. Sanders picked up Johnson and ordered him to undress and dispose of his clothing; Sanders then drove him home. Cell phone tower geolocation data demonstrated that between 11:33 p.m. and 11:50 p.m. on the night of the shooting, Sanders's cell phone travelled from the vicinity of Boyd's house to Johnson's home in York County.

At trial, Johnson admitted that he had provided inconsistent accounts to police and Navy investigators but claimed that he did so because he feared Sanders, recounting Sanders's acts of violence in an unrelated incident. He maintained that Sanders was present during both the

---

[2] Johnson did not explain how he came to possess the stolen firearm after returning it to Sanders on March 15.

[3] Detective Baer testified that the analysis of Sanders's cell phone data and the Bluetooth information was only made possible by improved equipment which was not available when the cell phone was initially seized and only occurred about a week before trial.

burglary and shooting and had forced him to commit them by threatening to kill his friends and family. Johnson also claimed that while he and Sanders were incarcerated together following their arrests, Sanders asked him to "take the charges" for him so that he could "get out." Johnson initially agreed to do so but reconsidered because he grew concerned for his family's safety.

At the conclusion of the Commonwealth's evidence, Sanders moved to strike the charges, arguing that the evidence established only that he may have been present during the commission of the crimes, which is insufficient to establish his guilt as an accomplice.[4] The trial court denied the motion. After argument by counsel, the jury convicted Sanders of aggravated malicious wounding, receiving a stolen firearm, statutory burglary, and two counts of grand larceny.

Before his sentencing hearing, Sanders moved to set aside the jury's verdict, arguing that the evidence was insufficient to sustain his convictions because Johnson's testimony was inherently incredible. The trial court denied the motion. Sanders also moved the court to set aside the jury's verdict and order a new trial based on after-discovered impeachment evidence. Sanders asserted that following his convictions, he learned that Johnson admitted to falsely testifying at trial that Sanders was present during the burglary and Boyd's shooting and had compelled Johnson to commit the crimes.

At an evidentiary hearing on the motion, Sanders introduced four sworn affidavits from different inmates at the Hampton City Jail detailing Johnson's admissions. In an affidavit dated May 11, 2018, Mikal Brown averred that he had been incarcerated with Johnson at Hampton City Jail for three months, during which time Johnson admitted that Sanders "never threatened Johnson" or his family and Sanders "was not with" Johnson during the burglary or shooting. Johnson admitted to Brown that he "lied . . . about [Sanders] making him shoot" Boyd and

---

[4] During his motion to strike, Sanders stipulated that, except for his identity as the perpetrator, the Commonwealth's evidence established the elements of each charge.

commit the "B&E" because "the police and Commonwealth told him to tell the lie to save himself." In another affidavit dated May 13, 2018, JaVaun King averred that while he was incarcerated with Johnson at Hampton City Jail from August 2015 to April 2017, Johnson said that detectives pressured him to confess falsely that Sanders forced Johnson to shoot Boyd.

John Ezzell stated in a June 19, 2018 affidavit that while he was "roommates" with Johnson at the Hampton City Jail from October 2017 until May 2018, Johnson discussed the burglary charge and said that his "military friends" had agreed to "report their guns stolen" so that Johnson "could sell them to get a car." But "[l]ess than 24 hours later," Johnson "shot himself in the leg" with a handgun "from the fake burglary" and "lied" about the incident to police. Describing Boyd's shooting, Johnson admitted that "his girlfriend," not Sanders, "drove him to where a man was shot [six] times." Johnson told Ezzell that he "made a statement under duress" to detectives, hoping for "lesser charges." In an August 25, 2018 affidavit, Hampton City Jail inmate Rodgerick Williams stated that Johnson told him that detectives had pressured Johnson to confess that "Sanders made [him] commit the shooting and burglary."

Testifying for the Commonwealth, Detective Baer admitted that during the interview on May 5, Johnson repeatedly denied involvement in the burglary or Boyd's shooting until the detective said that he believed that Johnson "shot [Boyd] and Sanders made him do it." Detective Baer denied that he had "push[ed] a theory" that Sanders compelled Johnson to commit the crimes, although he acknowledged that he first suggested that Sanders forced Johnson to shoot Boyd.

Following argument, the trial court found that the affidavits contained new evidence that "could not have been discovered" or "secured" through reasonable diligence before trial "because . . . Johnson didn't make these statements until after trial." The court also found that the evidence was not merely cumulative, corroborative, or collateral because "[a]ll this is about

- 8 -

Mr. Johnson's testimony." But the trial court found that the evidence was not "material" because it would not "produce an opposite result" at a new trial. The court found that although "there's a problem with Mr. Johnson's testimony" because he "lied to the police," and "may have lied at trial" and "in the affidavits," the Commonwealth's case was not based solely on Johnson's credibility. Rather, "plenty of other evidence" established Sanders's guilt, including the "photo of the gun on . . . Sanders' phone," the "cell phone tower records," and the "[B]luetooth headset" establishing that he and Johnson "were communicating with each other." Accordingly, the trial court denied the motion for a new trial. Sanders appeals.

ANALYSIS

I. Sufficiency

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

- 9 -

Sanders contends that the evidence was insufficient to sustain his convictions because Johnson's inconsistent accounts rendered his testimony inherently incredible as a matter of law. Sanders emphasizes that Johnson's testimony contradicted "his earlier out-of-Court statements" about "how he was shot while in his car" and whether he had participated in the burglary or Boyd's shooting.

"Determining the credibility of witnesses . . . is within the exclusive province of the [fact finder], which has the unique opportunity to observe the demeanor of the witnesses as they testify." *Dalton v. Commonwealth*, 64 Va. App. 512, 525 (2015) (first alteration in original) (quoting *Lea v. Commonwealth*, 16 Va. App. 300, 304 (1993)). "[T]he conclusions of the fact finder on issues of witness credibility may be disturbed on appeal only when we find that the witness' testimony was 'inherently incredible, or so contrary to human experience as to render it unworthy of belief.'" *Ragsdale v. Commonwealth*, 38 Va. App. 421, 429 (2002) (quoting *Ashby v. Commonwealth*, 33 Va. App. 540, 548 (2000)). "Evidence is not 'incredible' unless it is 'so manifestly false that reasonable men ought not to believe it' or 'shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Gerald v. Commonwealth*, 295 Va. 469, 487 (2018) (quoting *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006)).

Consistent with those principles, it is well-established that the uncorroborated testimony of an accomplice, if believed, may be sufficient to sustain a conviction. *Yates v. Commonwealth*, 4 Va. App. 140, 143 (1987). In addition, testimony "may be contradictory or contain inconsistencies without rising to the level of being inherently incredible as a matter of law." *Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019).

The record supports the trial court's finding that Johnson's testimony was not inherently incredible. At trial, Johnson testified that he and Sanders broke into Hansley and Simpson's

apartment and stole their property, including Simpson's handgun. Johnson subsequently gave Sanders the stolen handgun. Later, at Sanders's direction and with his assistance, Johnson repeatedly shot Boyd. That testimony, if believed, was sufficient to sustain Sanders's convictions. *See Yates*, 4 Va. App. at 143.

Although Johnson provided contradictory accounts of the burglary and shooting to investigators, those contradictions did not render his testimony inherently incredible as a matter of law and were, instead, properly submitted to the jury. *Kelley*, 69 Va. App. at 626. Indeed, Johnson's testimony that he had witnessed Sanders commit a shooting in an unrelated incident and that Sanders threatened to kill his family and friends if he refused to commit the crimes offered a plausible explanation to the jury about why he initially lied to investigators. *Cf. Fordham v. Commonwealth*, 13 Va. App. 235, 240 (1991) (holding testimony not inherently incredible where the defendant "intimated that his testimony had changed" because "he had previously feared for his life and had been afraid to tell the truth"). Additionally, that police found Johnson's driving permit in Sanders's car and the photograph of Simpson's stolen gun on Sanders's cell phone—combined with the cell tower location data establishing that Sanders's cell phone was present in the vicinity of the crimes during their commission—corroborated Johnson's testimony implicating Sanders. *See Lambert v. Commonwealth*, 70 Va. App. 740, 760 (2019) (holding testimony not inherently incredible where corroborated by other evidence).

In sum, the inconsistencies in and impeachment of Johnson's testimony were properly submitted to the jury which, as fact finder, was entitled to weigh them with the other evidence in assessing Johnson's credibility. *Id.* Accordingly, the trial court did not err in concluding that Johnson's testimony was not inherently incredible.

## II. Motion for New Trial

"Rule 3A:15(c) permits a trial court to 'grant a new trial if it sets aside the verdict' based on after-discovered evidence." *Bondi v. Commonwealth*, 70 Va. App. 79, 92 (2019). "A motion for a new trial based on after-discovered evidence is a 'matter submitted to the sound discretion of the circuit court and will be granted only under unusual circumstances after particular care and caution has been given to the evidence presented.'" *Id.* (quoting *Orndorff v. Commonwealth*, 279 Va. 597, 601 (2010)). "We will not reverse the court's decision except for an abuse of discretion." *Id.*

Sanders contends that the trial court erred in denying his motion to set aside the verdict and order a new trial because "[f]our additional disinterested witnesses provid[ed] substantial, new impeachment of . . . Johnson's trial testimony" that Sanders was present during the burglary and shooting and forced Johnson to commit the crimes. In addition, he maintains that the court acknowledged that Johnson's trial testimony was "essentially worthless" given the substantial impeachment at trial. He therefore concludes that the new impeachment evidence would have further undermined Johnson's credibility and produced "a different result at a new trial."

To warrant a new trial, a defendant must show that the after-discovered evidence: "(1) appears to have been discovered subsequent to the trial," "(2) could not have been secured for use at the trial in the exercise of reasonable diligence by the movant," "(3) is not merely cumulative, corroborative or collateral," and "(4) is material, and such as should produce opposite results on the merits at another trial." *Odum v. Commonwealth*, 225 Va. 123, 130 (1983). "The moving party must establish each of these mandatory criteria." *Bondi*, 70 Va. App. at 92 (quoting *Commonwealth v. Tweed*, 264 Va. 524, 529 (2002)). The trial court found that Sanders satisfied the first three elements but failed to demonstrate materiality.

"To prove materiality, a defendant must show that the new evidence 'should produce opposite results on the merits at another trial.'" *Id.* at 93 (quoting *Odum*, 225 Va. at 130). "Although after-discovered evidence merely impeaching a witness is generally not grounds for a new trial, the motion may be granted if the witness to be impeached is the 'key prosecution witness.'" *Id.* (quoting *Whittington v. Commonwealth*, 5 Va. App. 212, 216 (1987)). "[W]here the newly-discovered evidence consists of statements the witness himself has made after the trial, under circumstances which, if true, are sufficient to show that the verdict was based on noncollusive mistaken or perjured testimony," the trial court may grant a new trial. *Mundy v. Commonwealth*, 11 Va. App. 461, 480, *adopted on reh'g en banc*, 11 Va. App. 461 (1990). However, the assertion of new evidence impeaching the key prosecution witness does not end the trial court's inquiry. The defendant "must still establish that the evidence is 'material to the extent that the outcome of the trial would have been affected.'" *Bondi*, 70 Va. App. at 93 (quoting *Lamm v. Commonwealth*, 55 Va. App. 637, 645 (2010)).

"The trial court must determine whether, after eliminating disputed testimony, there remains sufficient evidence to sustain the verdict." *Whittington*, 5 Va. App. at 217. "If the evidence is sufficient to sustain the verdict, a new trial should not be ordered. If the evidence is not sufficient, a new trial should be ordered, and the fact finder must determine whether the disputed testimony is worthy of belief." *Id.* This requires consideration of all the evidence in the record, both during the trial and in support and opposition to the motion for a new trial. *See Orndorff v. Commonwealth* (*Orndorff I*), 271 Va. 486, 504-05 (2006) ("When, as here, the evidence supporting the new trial motion is contradicted by evidence in opposition to the motion, the circuit court is not permitted to presume that the moving party's evidence is true but is required to weigh all the evidence presented in determining whether the moving party has satisfied the materiality standard articulated in [our caselaw]. Thus, when a circuit court is

presented with conflicting evidence in considering a motion for a new trial, the court's role resembles that of a fact finder in determining whether the evidence is such that it should produce an opposite result on the merits at a new trial." (citations omitted)).

Employing these principles, we have found that after-discovered impeachment evidence justified a new trial where, following the defendant's conviction for rape, the victim admitted that the defendant did not rape her. *Whittington*, 5 Va. App. at 217. We emphasized that the victim's testimony was "essential to sustain the verdict" because "[n]o medical or physical evidence corroborated her claim." *Id.* at 216-17. By contrast, we found that a new trial was not warranted despite newly discovered evidence that a prosecution witness admitted that he shot the victim during a robbery rather than the defendant because there was "an abundance of [independent] evidence upon which the jury could conclude" that the defendant shot the victim. *Mundy*, 11 Va. App. at 484. Forensic evidence established that the victim was killed by a .45-caliber bullet and two other accomplices testified that the defendant used a .45-caliber pistol, which differed from the caliber of their revolvers. *Id.*

Here, Sanders presented four affidavits in support of his motion for a new trial stating that Johnson admitted that Sanders was not present during the commission of the burglary or Boyd's shooting and did not force Johnson to commit the crimes. The trial court did not abuse its discretion by concluding that those affidavits were not material, however, because even without the portion of Johnson's testimony that they contradict, the evidence was sufficient to sustain Sanders's convictions. *Whittington*, 5 Va. App. at 217. Specifically, although the affidavits aver that Sanders did not make Johnson shoot Boyd, or threaten Johnson or his family members to coerce him to do so, only one states that Sanders was not physically present for the shooting. Moreover, the affidavits do not assert that Sanders did not help plan the shooting or

assist Johnson in carrying it out. This distinction is important as Sanders need not be physically present to be criminally responsible for these crimes.

"In the case of every felony, every principal in the second degree and every accessory before the fact may be indicted, tried, convicted and punished in all respects as if a principal in the first degree." Code § 18.2-18. "A principal in the first degree is the actual perpetrator of the crime." *Thomas v. Commonwealth*, 279 Va. 131, 156 (2010) (quoting *Muhammad v. Commonwealth*, 269 Va. 451, 482 (2005)). A "principal in the second degree . . . is one who is present, actually or constructively, assisting the perpetrator in the commission of the crime." *Id.* "To hold the accused accountable as a principal in the second degree [under Code § 18.2-248.01], the Commonwealth must prove the accused was 'present, aiding and abetting, by helping some way in the commission of the crime.'" *Washington v. Commonwealth*, 43 Va. App. 291, 306 (2004) (quoting *Ramsey v. Commonwealth*, 2 Va. App. 265, 269 (1986)). "It must be shown that the accused shared the criminal intent of the principal or 'committed some overt act in furtherance of the offense.'" *Id.* (quoting *Sutton v. Commonwealth*, 228 Va. 654, 666 (1985)).

Again, none of the affidavits claim that Johnson admitted that Sanders was totally uninvolved in the shooting or burglary, or that he did not assist in planning or carrying out these crimes.[5] Absent Johnson's trial testimony that Sanders coerced him into committing the

---

[5] Although the dissent contends that the affidavit of Williams contains an assertion that Johnson told police "*Sanders had nothing to do with the shooting or the burglary*," the trial court was entitled to view that evidence differently. Williams stated that as Johnson was "defend[ing] his honor" by fighting another inmate who had accused him of being "a snitch," Johnson explained what happened during the interrogation.

> I'm just listening to Derrick vent as he rambled on to say that when he was questioned by the detectives; they asked him about Sanders during the interrogation and Derrick said he told them that Sanders was a 'good dude,' . . . [b]ut as the interrogation went on, the detectives kept stating that Sanders made me commit the shooting

- 15 -

shooting and that Sanders was physically present for the shooting, Johnson's other testimony regarding Sanders's involvement still stands. There was thus "an abundance of evidence upon which the jury could conclude" that Sanders was either physically or constructively present during the burglary and shooting and assisted in committing the crimes. *Mundy*, 11 Va. App. at 484.

As to the burglary, there was still evidence that Johnson showed a photograph of Simpson's firearms to Sanders, who said that he "wanted" the weapons and intended "to get them by any means necessary." Johnson and Sanders then conspired to obtain the key to Hansley and Simpson's apartment to steal the weapons. This testimony was corroborated by the fact that the firearms were stolen from a locked apartment with no signs of "forced entry." Cell phone tower geolocation data established that shortly before midnight on March 13, Sanders's cell phone was near Hansley and Simpson's apartment. *See Edwards v. Commonwealth*, 68 Va. App. 284, 298-99 (2017) (holding defendant's cell phone geolocation data established his presence near crime scene and opportunity to commit murder). Police also found Johnson's driving permit inside Sanders's car, consistent with Johnson's testimony that he emptied his pockets in Sanders's vehicle before entering the apartment to commit the thefts. Additionally, police found a photograph of Simpson's stolen handgun on Sanders's cell phone. The photograph was taken at 8:50 p.m. on March 15, 2015, which corroborated Johnson's testimony that he gave the gun to Sanders after accidentally shooting himself with it the night after the burglary. From the above evidence, it was reasonable for the jury to conclude that Sanders was

---

and burglary no matter how many times I told them Sanders had nothing to do with the shooting or the burglary.

We find that the trial court acted within its discretion when it determined that this affidavit did not outweigh "plenty of other evidence that the Commonwealth presented" and would not produce a different result at trial.

- 16 -

present during the burglary and thefts, participated in their commission, and later knowingly received Simpson's stolen firearm.

As to the shooting, Johnson's unchallenged testimony[6] established that after learning that Boyd reported the March 24 assault to police, Sanders convened a meeting during which he plotted to kill Boyd to prevent him from testifying against his uncle. At trial, Johnson testified that Sanders discussed having a woman lure Boyd into a trap and he and Sanders drove past Boyd's workplace. Consistent with that testimony, Boyd testified at trial that, a few days before the shooting, a suspicious vehicle drove past his workplace and a "young lady" approached him and looked inside his vehicle while he was parked outside his residence. And on April 21, 2015—following these discussions and plans with Sanders—Johnson approached Boyd's car and repeatedly shot him.

Sanders's involvement in the shooting was corroborated by extrinsic evidence. Cell phone tower geolocation data established that both Johnson and Sanders's cell phones were near Boyd's residence. Further, the cell phone records also established that Sanders called Johnson's cell phone immediately before the shooting; that call lasted approximately five minutes. The shooting was reported "[j]ust after that phone call." Both cell phones travelled toward Johnson's residence soon thereafter. Again, while the affidavits offered by Sanders established that

_____

[6] Despite Sanders's suggestion that the trial court found Johnson's testimony "essentially worthless," the record demonstrates otherwise. Although the trial court found that Johnson "may have lied" and that "there's a problem with . . . Johnson's testimony," it then noted the multitude of corroborating evidence and never discarded the entirety of Johnson's testimony or statements. This is consistent with our past precedent, requiring the trial court weigh the credibility of the evidence presented. *See Orndorff I*, 271 Va. at 504-05. Here it was not an abuse of discretion for the trial court to weigh all the evidence, including both the evidence presented at trial and the conflicting evidence contained in the affidavits, and make the determination that the materiality standard was not met in this case. *See Odum*, 225 Va. at 131 ("[T]he trial court, assessing the credibility of defendant's witnesses both at trial and at the motion hearing [for a new trial], properly could find that it was not such as should produce opposite results on the merits at another trial. At a future trial, the contents of [defendant's new evidence] would be only the latest in a series of inconsistent statements.").

Sanders did not force Johnson to commit these crimes—and one affidavit stated that Sanders was not present for the shooting—they do not contradict the remaining evidence implicating Sanders in these crimes. This evidence was significant—and while the inmates' affidavits did attack Johnson's reliability, they simply did not foreclose Sanders's involvement in these crimes.

Considering the totality of those circumstances, the jury reasonably inferred that Sanders intended to kill Boyd, had a motive to do so, was either actually or constructively present, aiding and abetting Johnson during the shooting, and therefore was guilty as a principal in the second degree. *Cf. Pugliese v. Commonwealth*, 16 Va. App. 82, 94-95 (1993) (holding evidence was sufficient to prove defendant guilty of robbery and murder as principal in the second degree where he knew his confederates intended to rob and kill the victim and was present and assisting them during the commission of the crimes).

In sum, the record establishes that, even without Johnson's disputed trial testimony, the evidence at trial amply supports the jury's conclusion that Sanders was present during the burglary and shooting and assisted in committing the crimes. Accordingly, as Sanders failed to establish that the after-discovered impeachment evidence was "material," the trial court did not abuse its discretion in denying Sanders's motion to set aside the verdict and order a new trial. *Cf. Mundy*, 11 Va. App. at 484 (holding after-discovered impeachment evidence did not justify a new trial where the evidence at trial was otherwise sufficient to sustain the defendant's convictions).

CONCLUSION

For the above reasons, we affirm the trial court's judgment.

*Affirmed*.

Chaney, J., dissenting.

I respectfully dissent because I would hold that the trial court abused its discretion in denying Sanders's motion for a new trial based on its finding that the after-discovered evidence was immaterial.[7] "To prove materiality, a defendant must show that the new evidence 'should produce opposite results on the merits at another trial.'" *Bondi v. Commonwealth*, 70 Va. App. 79, 93 (2019) (quoting *Odum v. Commonwealth*, 225 Va. 123, 130 (1983)). The uncontested after-discovered evidence shows that Sanders's convictions were based on perjured trial testimony by the prosecution's key witness. Therefore, I would hold that the trial court committed a clear error in judgment in finding that the after-discovered evidence is immaterial. *See Barnes v. Commonwealth*, 72 Va. App. 160, 167 (2020) ("[A] trial court abuses its discretion[] when . . . it considers all proper factors, and no improper ones, but, in weighing those factors, the court commits a clear error in judgment.").

According to after-discovered evidence from four independent witnesses, the Commonwealth's key witness against Sanders—Derrick Johnson—admitted to falsely testifying that Sanders threatened to harm Johnson's family and friends if Johnson did not burglarize his friends' apartment, steal his friend's guns, and shoot Corey Boyd. The post-trial witnesses attested that Johnson said detectives repeatedly pressured him to falsely testify that Sanders made him

---

[7] The trial court found that Sanders established three of the four requirements that must be met to warrant granting a new trial based on after-discovered evidence.

> [F]our requirements must be met before a new trial is granted based upon an allegation of newly-discovered evidence: (1) the evidence was discovered after trial; (2) it could not have been obtained prior to trial through the exercise of reasonable diligence; (3) it is not merely cumulative, corroborative or collateral; and (4) is material, and as such, should produce an opposite result on the merits at another trial.

*Mundy v. Commonwealth*, 11 Va. App. 461, 480, *adopted on reh'g en banc*, 11 Va. App. 461 (1990).

- 19 -

commit the crimes. According to the after-discovered evidence from affiant John Ezzell, Johnson also admitted that he falsely testified at trial that Sanders was his driver at the time of the shooting when, in fact, Johnson's girlfriend was his driver. According to affiant Rodgerick Williams, Johnson claimed that he finally yielded to police pressure to falsely implicate Sanders after "many times [he] told them *Sanders had nothing to do with the shooting or the burglary*." Affiant Ezzell also attested that Johnson admitted he implicated Sanders "under duress and lied about Mr. Sanders['s] involvement with these crimes in hope for lesser charges." This after-discovered evidence refutes the majority's contention that "none of the affidavits claim that Johnson admitted that Sanders was totally uninvolved in the shooting or burglary."

Affiant Ezzell further attested that Johnson admitted to falsely testifying about a burglary and larceny at his friends' apartment. According to Ezzell's affidavit, Johnson admitted that after Johnson's car was destroyed in a fire, Johnson's friends let him sell their guns to buy another car and falsely reported that the guns were stolen in a burglary.

Johnson's trial testimony was rendered utterly unreliable by the after-discovered evidence that Johnson admitted giving perjured trial testimony implicating Sanders in the crimes. Thus, the after-discovered evidence—which was not contradicted at the hearing on Sanders's motion for a new trial—should produce an opposite result on the merits at another trial because Johnson's testimony was essential to the Commonwealth's case against Sanders. Therefore, the after-discovered evidence is material and the trial court's contrary finding was a clear error in judgment.

In denying Sanders's motion to set aside the convictions, the trial court reasoned that the after-discovered evidence of Johnson's admitted perjury would not produce a different result at a new trial because the trial evidence already showed that Johnson was a liar. The evidence supports the trial court's findings that "Johnson lied to the police" and "has told many, many different stories." But the trial court unreasonably concluded that the after-discovered impeachment evidence

- 20 -

would not affect the jury's credibility determinations regarding Johnson's testimony implicating Sanders in the crimes. In convicting Sanders, the jury apparently credited Johnson's trial testimony implicating Sanders in the burglary and shooting, notwithstanding Johnson's multiple lies to the police and multiple versions of events. Significantly, the trial court did not find the after-discovered evidence of Johnson's admitted perjury to be incredible. Thus, the after-discovered evidence that Johnson admitted giving perjured trial testimony implicating Sanders in the crimes "ought to produce opposite results on the merits" at another trial. *See Orndorff v. Commonwealth*, 271 Va. 486, 504 (2006) (quoting *Lewis v. Commonwealth*, 209 Va. 602, 609 (1969)).

Additionally, the rest of the evidence apart from Johnson's testimony is insufficient to prove Sanders's guilt, contrary to the trial court's conclusion. The trial court concluded that the Commonwealth's case "was based on plenty of other evidence" and did not rely on Johnson's credibility. The trial court found that the other evidence supporting Sanders's convictions includes (i) a photo of the gun on Sanders's phone; (ii) evidence that the gun was found in Johnson's house; (iii) cell phone tower records showing that Johnson and Sanders were communicating with each other; (iv) a Bluetooth headset showing that Johnson and Sanders were communicating; and (v) a witness's identification of Johnson as they passed each other after Johnson's first police interview.[8] In addition, the majority notes that the police found Johnson's driver's permit in Sanders's car when Sanders was arrested.

---

[8] Detective Carpenter—who investigated both the March 2015 beating and pistol-whipping of Boyd and the April 2015 shooting of Boyd—was with Cassie Seals when she recognized Johnson leaving a police interview room. Seals identified Johnson as one of the persons present in her home in March 2015 when Boyd was beaten and pistol-whipped.

Seals's daughter—who was also Boyd's girlfriend—testified that Seals also hit Boyd during the March 2015 beating. Boyd and his girlfriend both testified that Sanders intervened and stopped that beating and helped them out of Seals's house. Sanders's charges at trial did not include any charges related to the March 2015 beating and pistol-whipping.

Considering the totality of the evidence independent of Johnson's testimony, the evidence is insufficient to prove Sanders's guilt. The evidence of the gun found at Johnson's house and the witness's identification of Johnson implicate Johnson in the crimes, but do not implicate Sanders. The other evidence identified by the trial court is also insufficient to prove Sanders's guilt. The photo of the gun on Sanders's phone was taken on March 15, 2015, at 8:50 p.m.—around 45 hours after the purported burglary and more than a month before the shooting of Boyd.[9] Assuming arguendo that the gun was stolen in a burglary of Johnson's friends' home, the photo in Sanders's phone—apart from Johnson's testimony—does not support a reasonable inference that Sanders participated in—or was even aware of—the burglary or the larceny of the guns. Additionally, without Johnson's testimony, the fact that Johnson's driver's permit was found in Sanders's car when Sanders was arrested does not support a reasonable inference that Sanders participated with Johnson in any criminal activity.

The cell phone tower records also fail to provide independent evidence to support a finding that Sanders was at Johnson's friends' apartment at the time of the purported burglary. First, Johnson's testimony provided the only evidence that the burglary occurred around midnight on March 14, 2015. But Johnson's friends told police that the burglary could have occurred anytime between 3:00 p.m. on March 13 and 12:00 noon on March 14, when they were away from their apartment. Additionally, as Detective Baer testified at trial, the cell tower records showed only that on March 14 around midnight, Sanders's cell phone was used in the same cell tower "sector" where Johnson's friends' apartment was located. As explained at trial, the area surrounding the cell tower is divided into three 120-degree sectors extending outward

---

[9] Officer Meyer testified at trial that Johnson's friends, Marquell Simpson and Tyrese Hansley, reported that their apartment was burglarized between 3:00 p.m. on March 13, 2015, and 12:00 noon on March 14, 2015. Johnson testified at trial that the burglary occurred around midnight on March 14, 2015.

from the cell tower. There was no evidence regarding the square mileage of the cell tower sector in which Johnson's friends' apartment was located. As Detective Baer testified, the police could not determine the location of Sanders's cell phone within the cell tower sector. Thus, without Johnson's testimony, the evidence does not support a finding that Sanders's cell phone was ever located at or near the scene of the purported burglary. Detective Baer also acknowledged that there is no way to determine who was using the cell phone at that time, nor what they were saying. Therefore, without Johnson's testimony, the evidence is insufficient to support Sanders's convictions for burglary and the related larceny and firearm offenses.

Moreover, according to the after-discovered evidence, Johnson admitted that his friends falsely reported a burglary and larceny of guns after allowing Johnson to sell the guns to buy a car. This after-discovered evidence ought to produce opposite results on the merits at another trial on the burglary and related larceny and firearm offenses.

The evidence independent of Johnson's testimony is also insufficient to prove Sanders guilty of maliciously wounding (by shooting) Boyd. Although the cell tower records showed that a call between Sanders's and Johnson's cell phones was made around the time of the shooting and that Sanders's cell phone was "in the area of the shooting during that phone call," this evidence did not place Sanders's phone at or near the scene of the shooting. As clarified at trial, the evidence showed only that the call was made in the same cell tower sector that included the address of the shooting. Because there was no evidence about the square mileage of this cell tower sector, the evidence does not support an inference that Sanders's cell phone was located at or near the scene of the shooting around the time of the shooting. Also, apart from Johnson's testimony, the evidence does not show who was using the cell phone and Bluetooth device at the time, nor what they were saying. Therefore, without crediting Johnson's testimony, rational fact-finders would be unable to convict Sanders of maliciously wounding Boyd.

Although the after-discovered evidence includes Johnson's admission that he "lied about Mr. Sanders['s] involvement with these crimes in hope for lesser charges," the majority unreasonably characterizes much of Johnson's trial testimony implicating Sanders as "unchallenged." After-discovered evidence of Johnson's admitted perjury implicating Sanders challenges his credibility as a witness against Sanders. Given the after-discovered evidence, no reasonable fact-finder could regard as "unchallenged" Johnson's testimony that (i) Sanders said he wanted Johnson's friend's firearms and intended to get them by any means necessary; (ii) Sanders and Johnson conspired to obtain a key to Johnson's friends' apartment to steal the guns; (iii) Sanders directed Johnson to empty his pockets in Sanders's vehicle before the burglary; (iv) Sanders held a meeting to plot the killing of Boyd; (v) Sanders plotted to use a woman to lure Boyd into a trap; (vi) Sanders informed Johnson that he was coming to pick him up on the night of the shooting and directed Johnson to bring a gun; (vii) Sanders directed Johnson to dress in dark clothing on the night of the shooting; (viii) Sanders drove Johnson to a 7-Eleven parking lot on the night of the shooting and instructed Johnson to kill Boyd; and (ix) Sanders confirmed that Boyd was in the driver's seat before Johnson shot Boyd. The sole source of all of this evidence is Johnson's trial testimony, which is rendered unreliable by the after-discovered evidence of Johnson's admitted perjury in implicating Sanders. Yet the majority concludes—primarily based on this testimony from Johnson—that the after-discovered evidence would not affect the verdicts. Because the Commonwealth's case against Sanders was insufficient without Johnson's testimony, the after-discovered evidence of Johnson's admitted perjury in implicating Sanders should produce an opposite result on the merits at another trial. Thus, the after-discovered evidence is material.

For the foregoing reasons, I would reverse the trial court's judgment, vacate Sanders's convictions, and remand the cases to the trial court for a new trial. Therefore, I respectfully dissent.